PEOPLE v JENKINS

PEOPLE v JOINER

PEOPLE v SHERRER

Docket Nos. 53300-53302. Submitted November 4, 1981, at Lansing.—
Decided April 21, 1982. Leave to appeal applied for.

Michael Jenkins, Danny Joiner and Wendell Sherrer were each
charged in Oakland Circuit Court with carrying a concealed
weapon. At a pretrial hearing, the defendants moved to sup-
press the weapons. The court, Robert L. Templin, J., held that
the search of defendants' car was illegal and that evidence of
the weapons had to be suppressed as the fruit of an illegal
search. The charges against the defendants were dismissed. The
people appeal. *Held:*

The evidence was properly suppressed. The prosecution never
contended that the police had probable cause to search the
defendants' vehicle or that the seizure of the weapons was
proper under a plain view theory. Rather, the prosecution
argued that the police had a right to conduct a limited protec-
tive search of the car based on their reasonable concern for
their personal safety. The facts show that the police were not
motivated by fear for their own safety but rather by a desire to
find evidence of criminal activity. This search would have been
proper only if the suspicious nature of defendants' behavior had
suggested that the police officers were in danger while they
made their preliminary investigation. The behavior of the
police officers at the time of the stop does not support a finding
that they believed they were in danger.

Affirmed.

Bronson, P.J., dissented. He would reverse the circuit court's

---

References for Points in Headnotes

[1, 2] 29 Am Jur 2d, Evidence § 415.

"Fruit of the poisonous tree" doctrine excluding evidence derived
from information gained in illegal search. 43 ALR3d 385.

Modern status of rule governing admissibility of evidence obtained
by unlawful search and seizure. 50 ALR2d 531.

[3] 68 Am Jur 2d, Search and Seizure §§ 56, 102.

decision to suppress the evidence and dismiss the charges. It is his belief that under the totality of the circumstances the officers' concern that the defendants might be secreting weapons in the car was based on articulable reasons and justified the intrusion. He is of the opinion that a protective search may extend from a person to a vehicle from which the person has exited.

### OPINION OF THE COURT

1. SEARCHES AND SEIZURES — SUPPRESSION OF EVIDENCE.

Evidence of weapons seized by police during a search of a vehicle was properly suppressed and charges against the defendants of carrying a concealed weapon were properly dismissed where there was no probable cause to search the car, the plain view doctrine was inapplicable, and the facts showed that the police officers were not motivated to search the vehicle for their own safety but rather by a desire to find evidence of criminal activity.

### DISSENT BY BRONSON, P.J.

2. SEARCHES AND SEIZURES — SUPPRESSION OF EVIDENCE.

*It was error for a trial court to suppress the evidence seized and dismiss charges of carrying a concealed weapon on the basis of an illegal search in a case where, although the search was made without a warrant, there was no probable cause to believe a crime had been committed, and the plain view doctrine was inapplicable, the police officers involved in the stopping and searching of a vehicle were concerned that the defendants might be secreting weapons in the vehicle searched and the officers' concern was based on articulable reasons; the intrusion was justified as an extension of a protective search of the defendants.*

3. SEARCHES AND SEIZURES — PROTECTIVE SEARCHES.

*A protective search, one which is prompted by a police officer's fear of violence while pursuing an investigation, may extend from a person to a vehicle from which the person has exited.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief Appellate Counsel, and *Thomas S. Richards,* Assistant Prosecuting Attorney, for the people.

*Moll, Desenberg, Bayer & Behrendt* (by *Stephen D. McGraw*), for defendant Jenkins.

*Yuille, Zeleznik, Plourde & Russell* (by *Ray G. Tallerday*), for defendant Joiner.

*Edward J. Soma,* for defendant Sherrer.

Before: Bronson, P.J., and T. M. Burns and J. T. Corden,* JJ.

J. T. Corden, J. The defendants, Michael Jenkins, Danny Joiner, and Wendell Sherrer, were charged with carrying a concealed weapon, MCL 750.227; MSA 28.424. Two pistols were found in a car occupied by the defendants. Before trial, the defendants moved to suppress the pistols and a pretrial hearing was held. The trial judge held that the search of the car occupied by the defendants was illegal and that the pistols had to be suppressed as the fruit of the illegal search. The charges against the defendants were dismissed. The people appeal as a matter of right.

A clear picture of the facts leading up to the defendants' arrest in this case is essential. On September 15, 1978, at 12:30 a.m., the defendants pulled into the Troy Drive-In Theatre, located on Maple Road, just west of the I-75 overpass. The manager of the drive-in told the defendants that the drive-in was closed. The defendants left the drive-in and pulled into the parking lot of a restaurant next to the drive-in. The manager thought he saw someone get out of the car and move toward the drive-in property and he contacted the Troy Police Department.

The two Troy police officers responding to the call were on the look out for a "smaller type" blue

---

* Circuit judge, sitting on the Court of Appeals by assignment.

or light blue car occupied by three back men. They observed a similar car pull out of the restaurant parking lot onto Maple Road, and they followed the vehicle. The car stopped in the middle of the road and two black men ran out from a wooded field next to the drive-in and entered the car. The car drove off, followed by the police. One of the police officers testified that the back-seat passenger was moving around, looked back toward the officers two or three times, and that he then ducked down out of the officer's sight for a few seconds. The front-seat passenger also briefly bent down out of the sight of the officers.

The police officers stopped the car. The driver, defendant Jenkins, got out of the car and walked back toward the police car. The other two defendants remained seated in the car. One of the officers testified that Jenkins seemed extremely nervous. Jenkins got back into the car after talking to the police. One of the officers went to the car and talked to the back-seat passenger, Danny Joiner, for five to ten minutes. Joiner sat with his left leg across the seat, his right leg on the floor, and his arm on top of the seat. The other officer talked with Jenkins and with Sherrer, who remained seated in the front passenger seat.

Meanwhile, two other Troy police officers arrived on the scene. The original two officers compared the stories that the defendants had told them and realized that the stories conflicted. They ordered the defendants out of the car and placed them at the rear of their car where they were watched by the other Troy police officers. One of the officers entered the defendants' car and searched the back-seat area. He ran his hand along the crease in the back seat and pulled out a small pistol. He also saw a newspaper sticking out

from under the front seat. When he pulled the newspaper, a loaded revolver fell out. The defendants were arrested for carrying concealed weapons.

At the preliminary examination, the officer who searched the defendants' car testified that he had no information prior to the search that a crime had been committed or was about to be committed. When he entered the car he did not know what he would find, but he thought the defendants had something like weapons or contraband inside the car. At the preliminary examination, the defendants moved for suppression of the evidence, but the district court magistrate denied the motion and bound the defendants over for trial. The motion to suppress was renewed before the trial judge before trial. The trial judge found that there was no probable cause to search the car and that the search was not a protective search for weapons. The pistols were suppressed as evidence and the charges against the defendants were dismissed.

On appeal, the prosecution does not contend that the police had probable cause to search or that the seizure was proper under a plain view theory. Rather, it is argued that the police had a right to conduct a limited protective search of the car based on their reasonable concern for their personal safety.

In *People v Rosales,* 406 Mich 624; 281 NW2d 126 (1979), *cert den* 444 US 1025; 100 S Ct 689; 62 L Ed 2d 659 (1980), our Supreme Court held that, when the record does not show that the search was prompted by the officer's fear of violence while pursuing his investigation, *Terry v Ohio*[1] does not provide authority to validate the search without a warrant. The issue to be resolved in this case,

---

[1] 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

therefore, is whether the record shows that the police officer who searched the defendants' car did so out of a fear for his own safety. Despite the prosecution's efforts to distinguish the factual situation in *People v Rosales, supra,* we find the factual setting of the search in this case to be nearly identical in every way relevant to the determination of the police officers' fear of violence.

In *Rosales,* a police officer was informed at roll call that a young black man, who had been arrested for the robbery of an "after hours" place, had escaped. The man was described as being 5'8" tall with a dark complexion. Later, the police officer saw a young black man sitting in the passenger's seat of a van parked in front of a building where an "after hours" place was run. The defendant therein was sitting in the driver's seat. As the officer approached the van, the defendant moved in a manner that made it appear that "something was going on in the middle section of where his body was". The officer asked the defendant to step out of the van. He found a gun concealed under the carpeting of the vehicle. At the preliminary examination the officer testified that he was sure that there was a gun in the van by the movements of the defendant, by the way the van was illegally parked so as to block the entrance of the building, and by the fact that there had been numerous robberies of "after hours" places. The Supreme Court found that nothing in the record suggested that the police officer was acting in order to protect himself.

We reach a similar conclusion in this case and find that the pistols were properly suppressed. The prosecution stresses the police officers' observations of "furtive movements" by the occupants of

the car, especially by the passenger in the rear seat, defendant Joiner, while the car was being followed. One of the officers testified at the preliminary examination that he did not know what the defendants had in the car, but that he thought they had something like contraband or weapons. Yet, despite their suspicions, the police officers allowed the driver, defendant Jenkins, to return to the car after he had spoken to them. Furthermore, both officers stood at the car and spoke to the defendants for five to ten minutes. At that point they apparently did not have any fear for their safety. The prosecution points out the strange physical position maintained by defendant Joiner during the conversation with the police. Joiner sat on the right side of the back seat with his left leg extended across the seat. This strange position, however, did not trigger an immediate protective search by the police. It was only after the police compared the stories given by the defendants and found that they were inconsistent that they investigated further.

We find that the facts show that the police were not motivated by fear for their own safety, but rather by a desire to find evidence of criminal activity. We are not unmindful of the fact that the defendants were behaving in a very suspicious manner. Yet this search would be proper only if the suspicious nature of their behavior suggested that the police officers were in danger while they made this preliminary investigation. The police officers' behavior at the time of the stop does not support a finding that they believed they were in danger. At this juncture, *Rosales, supra,* applies and is controlling.

Further, the information the officers received subsequent to their five- to ten-minute discussion with the defendants does not make it more likely

that the defendants were dangerous at that time, although it does buttress the police officers' suspicion that the defendants may have been involved in criminal activity. The prosecution concedes, however, that their suspicion did not rise to the level of probable cause. Absent probable cause, any further search by the police was improper.

We affirm the lower court's suppression of the pistols and its dismissal of the charges against the defendants.

Affirmed.


T. M. BURNS, J., concurred.


BRONSON, P.J. *(dissenting)*. Defendants were charged with carrying a concealed weapon in a motor vehicle, MCL 750.227; MSA 28.424. The charges were dismissed when the circuit court concluded that the two pistols found in the car occupied by the defendants had been seized following an illegal search. My disagreement with the majority is essentially factual.

In my opinion, this case presents the following scenario, as developed at the preliminary examination. Defendants pulled into the Troy Drive-In at 12:30 a.m. on September 15, 1978. The manager informed defendants that the drive-in was closed. Defendants left the premises and drove to a restaurant located next to the theater. When the manager of the drive-in thought he saw someone get out of the car and move toward the theater, he called the police. Two Troy police officers responded to the call.

The officers turned into the parking lot of the restaurant just as an automobile matching the description given to the police was exiting from the area. The officers followed the vehicle, which

stopped in the middle of the road. At this point, two males ran from a field next to the drive-in and jumped into the car. The automobile was then driven off.

The police officers followed the car and observed the back-seat passenger glancing back toward them. At one point, this passenger ducked down into the seat. The officers pulled the car over in front of the Oakland Mall. One of the officers, Hartfelter, indicated that he and his partner waited to make the stop at this location because it was well lit and they were concerned about the possibility that defendants might possess a weapon.

Following the stop, defendant Jenkins, the driver, got out of the car and walked back to the police car. Officer Hartfelter stated that Jenkins was extremely nervous and his hands were trembling. He further indicated that in his many years as a police officer he had never seen anybody so nervous. After a brief discussion, Jenkins got back into his car.

At this time, Officers Bowers and Jordon arrived at the scene and informed Officer Hartfelter of the initial contact with the drive-in manager and defendants' move to the restaurant. Furthermore, it became obvious that the two passengers in the car had given Officer Hartfelter's partner stories which conflicted with Jenkins' explanation of what they were doing. Immediately thereafter, defendants were ordered out of the car. Officer Hartfelter entered the automobile and found a loaded "Saturday night special" where defendant Joiner's foot had been. The officer found a second loaded gun wrapped in some newspapers, sticking out from under the front seat.

The circuit court judge recognized that the ques-

tion of the legality of the search in this case was very close. Ultimately, he determined that it did not appear that the officers were concerned about their personal safety, so that a protective search was not justified pursuant to *Terry v Ohio,* 392 US 1; 88 S.Ct 1868; 20 L Ed 2d 889 (1968). The court further found that, although defendants' behavior was certainly suspicious, it did not rise to the level of probable cause to believe a crime had been committed.

The following excerpt from the prosecution brief very nicely expresses its position and the issue for our consideration:

"At the outset, it must be noted that the people *do not* argue that the police had probable cause to search the defendants' car, nor is the contention made that the seizure was proper under some theory of plain view. Rather, it is our contention that under the present facts, the police had a right to conduct a limited 'protective frisk' of the back-seat crevice area of the defendants' car based on their reasonable suspicion that weapons were in that area, and based on their reasonable concern for their personal safety."

The trial court concluded that *People v Rosales,* 406 Mich 624; 281 NW2d 126 (1979), *cert den* 444 US 1025; 100 S Ct 689; 62 L Ed 2d 659 (1980), was dispositive of the *Terry* protective search issue. The court emphasized that ten minutes passed before the defendants' vehicle was actually searched, and it believed that the officers were not really concerned for their safety.

While I certainly agree with the trial court's characterization of this problem as "close", I ultimately disagree with the conscientious and able judge's disposition of this matter.

As noted above, the court emphasized the time

lag between the stop and the search of the automo-
bile for possible weapons. I believe the judge
placed undue weight on this fact. Officer Hartfel-
ter specifically testified that defendants' car was
stopped where it was because he and his partner
believed the suspects might have a weapon. The
facts provide an explanation why there was not an
immediate protective search. That is, at the time
of the initial stops the circumstances of the situa-
tion were not fully developed. However, with the
additional information received from Officers Bow-
ers and Jordan and the inconsistencies in the
defendants' stories, the police had greater reason
to believe that the suspicious behavior of the
suspects was directed toward some criminal end
and more reason to be concerned for their safety. I
cannot fault the police officers for not immediately
conducting a *Terry* search. Indeed, by waiting for
further information before proceeding, the officers
were acting in a responsible manner. As new
information is obtained, police officers may have
more or less fear that an automobile contains
weapons.

Defendants emphasize that although Officer
Hartfelter testified that he believed something was
being concealed in the car, he did not necessarily
know what. The officer further indicated, however,
that he believed there might be weapons in the
car. *Terry* makes it clear that there need not be
certainty that the suspect is armed. Rather, the
issue is whether a reasonably prudent person
would be warranted in believing that his safety
could be in danger. While this belief must be based
on more than an "unparticularized suspicion", it
does not have to rise to the level of probable cause.
392 US 1, 27.

In addition to the concededly suspicious behavior

of the defendants outlined above, the officers also knew the Troy Drive-In to be the site of several recent robberies. Under the totality of the circumstances, the officers' concern that the defendants might be secreting weapons in the car was based on articulable reasons and justified the intrusion.

In *Rosales, supra,* 629, fn 8, the Michigan Supreme Court declined to determine whether a *Terry* protective search may extend from the person to a vehicle from which the person has exited. I agree with those courts which have held that the *Terry* rationale may be extended to searches of automobiles. *Inter alia: United States v Green,* 151 US App DC 35; 465 F2d 620, 624-625 (1972); *United States v Rainone,* 586 F2d 1132, 1134-1135 (CA 7, 1978), *cert den* 440 US 980; 99 S Ct 1787; 60 L Ed 2d 239 (1979); *United States v Ullrich,* 580 F2d 765, 769 (CA 5, 1978); *State v Wausnock,* 303 A2d 636 (Del, 1973); *Commonwealth v Silva,* 366 Mass 402; 318 NE2d 895 (1974); *State v Smith,* 56 Ohio St 2d 405; 384 NE2d 280 (1978); *State v Darling,* 393 A2d 530 (Me, 1978); *Brown v State,* 358 So 2d 596 (Fla App, 1978).

I would reverse.